In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-2445 & 09-2553

IGNACY GREEN, PATRICK COOPER,
and all those similarly situated,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

THE UPS HEALTH AND WELFARE PACKAGE
FOR RETIRED EMPLOYEES, UNITED PARCEL SERVICE
OF AMERICA, INC. and PLAN ADMINISTRATOR,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 00616—**Matthew F. Kennelly,** *Judge.*

ARGUED DECEMBER 7, 2009—DECIDED FEBRUARY 10, 2010

Before CUDAHY, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In this class-action lawsuit, the
plaintiffs, participants in the UPS Health and Welfare

Package for Retired Employees (Plan) due to their former employment with UPS as members of the International Brotherhood of Teamsters (IBT) Local 705, claim that the defendants, United Parcel Service of America, Inc., the Plan, and its administrator (we will refer to them collectively as UPS), raised the amount of health insurance contributions required of the Local 705 retirees in violation of the Plan and, consequently, the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1104(a)(1)(D). Specifically, the Local 705 retirees argue that the Plan's requirements that (1) if a threshold cost was met, all retirees would "share equally in the cost . . . by making an additional contribution" and (2) the additional contributions would not be implemented until after the expiration of the "current collective bargaining agreement" prohibit UPS from collecting additional contributions from them until 2013. UPS, on the other hand, asserts that the Plan can reasonably be interpreted to allow collections before that time.

After a bench trial, the district court found that the Local 705 retirees had the better of the argument regarding the first clause at issue but not the second. The court therefore enjoined UPS from collecting additional contributions from the Local 705 retirees in excess of the minimum contribution required for all IBT retirees under the Plan—but only until further order of the court, not until 2013. We review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002) (citing Fed. R. Civ. P. 52(a)(6)). The district court's findings of fact, however, are not in dispute. We begin there.

UPS employs IBT members and negotiates collective bargaining agreements (CBAs) with IBT's international union and separately with a few IBT locals, like Local 705.[1] Under the 2002 CBA between UPS and Local 705 (expiring July 31, 2008), UPS agreed to provide health insurance to retirees during the term of the agreement "as outlined in the new UPS Health & Welfare Package Summary Plan Description." Unlike the CBA, the Summary Plan Description (SPD) covered *all* IBT retirees (with a few exceptions), not just the Local 705 retirees.

Under the heading entitled "Contribution," the SPD provided that "[a]ll retired employees are responsible for a $50 per month contribution for their medical coverage," which covered "the retired employee, spouse and any eligible dependent children." Under the next heading, entitled "Average Annual Cost," the SPD stated as follows:

> The average annual cost per participant is defined as the total claims paid by the Plan in a calendar year, divided by the total number of Plan participants during that year. Each retired employee, each spouse, and each eligible dependent would be considered a Plan participant.
>
> If the average annual cost per participant exceeds $6,250, each retired employee will *share equally in the*

---

[1]  At oral argument, counsel for the retirees explained that Local 705 negotiates separately because it is a large union with a comparable amount of bargaining power.

*cost above the $6,250 maximum by making an additional contribution.*

The $6,250 maximum cost per participant is subject to future negotiations. If required, the additional contributions would not be implemented *until after the expiration of the current collective bargaining agreement.*

(Emphasis added.)

Beginning in 2006, the average annual cost per participant exceeded $6,250. In October 2007, UPS sent a Summary of Material Modifications (SMM) to all IBT retirees, stating this fact and also advising that "each retired employee will share equally in the cost above the $6,250 maximum by making an additional contribution. Therefore, effective January 1, 2008, the per retiree contribution of $50 per month will increase to $114.33 per month." At the time of this notice, UPS was negotiating a new CBA with IBT's international union. After the parties reached a tentative agreement but before ratification, the international union asserted complaints over the increase in retiree contributions. UPS eventually agreed (although not in writing) not to collect additional contributions from the international union retirees until after the expiration of their newly bargained CBA.

Members of Local 705 also complained about the October 2007 SMM. Their complaint, however, was that the notice was premature because *their* negotiations for a new CBA would not even begin until the summer of 2008 (and their current CBA would not expire until July). As a result, in December 2007, UPS sent a revised

SMM to the Local 705 retirees only. That notice stated as follows:

> The average cost per participant for the UPS Health and Welfare Package for Retired Employees *has exceeded* $6,250.

> As explained in the SPD (Summary Plan Description), when the cost per participant exceeds $6,250, each retired employee will share equally in the cost above the $6,250 maximum by making an additional contribution.

> That additional cost *will be effective* after the expiration of the current collective bargaining agreement.

(Emphasis added.) UPS received no complaints about this SMM.

During the CBA negotiations, a Local 705 representative asked UPS's finance liaison whether the previous SPD for the Plan was current with respect to the new CBA. UPS's liaison responded that it was. Local 705 did not propose raising the $6,250 cap or deferring the collection of additional contributions from retirees, nor did UPS raise the issue. The new CBA became effective August 1, 2008, for a five-year period. Like the 2002 CBA, the 2008 CBA did not directly address the issue of retiree contributions but rather simply incorporated the SPD, which continued to state that additional contributions would not be collected until the expiration of the "current" CBA.

In January 2009, UPS sent another notice to the Local 705 retirees, stating that the average annual cost per

participant had risen above the $6,250 cap. The notice also advised that, after February 1, 2009, instead of a flat-rate $50 per month, each Local 705 retiree would be required to contribute $157.58, $315.17, or $472.75 per month, depending on whether their family members were also covered. Consistent with the oral agreement between UPS and IBT's international union, other IBT retirees did not receive this notice and continued to pay only $50 per month.

Shortly thereafter, the Local 705 retirees filed this class-action lawsuit and brought a motion for temporary and preliminary injunctive relief, which the parties converted to a bench trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The district court found in favor of the Local 705 retirees on their claim that UPS violated the SPD by collecting additional contributions from them without also collecting from the other IBT retirees. The court found against the Local 705 retirees, however, on their claim that UPS violated the SPD by collecting additional contributions during the term of the 2008 CBA. The final order enjoined UPS from collecting additional contributions from the Local 705 retirees until further order of the court but did not enjoin UPS from collecting additional contributions through July 2013, as requested by the Local 705 retirees. Both parties appealed.

The parties agree that, because the dispute involves plan interpretation, and the Plan grants UPS discretion to interpret its terms, the district court properly applied the deferential arbitrary and capricious standard. *See*

*Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). A plan administrator's interpretation is not arbitrary and capricious if it falls within the range of reasonable interpretations. *See Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999); *Exbom v. Central States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990). Interpretations that "controvert the plain meaning of a plan," however, may be overturned. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996).

The first issue is whether the district court correctly concluded that UPS violated the SPD by collecting additional contributions from the Local 705 retirees without collecting from other IBT retirees covered by the Plan. The SPD states that "[i]f the average annual cost per participant exceeds $6,250, each retired employee will share equally in the cost above the $6,250 maximum by making an additional contribution." UPS contends that this provision allows it to collect additional contributions from the Local 705 retirees even though it is not collecting additional contributions from other IBT retirees because the phrase "share equally" concerns how the Plan *calculates* average costs, not how it *collects* additional contributions. The district court found that this interpretation contradicts the plain language and was therefore arbitrary and capricious. We agree.

The SPD states that each retired employee will "share equally . . . *by making an additional contribution*." As the district court pointed out, UPS's interpretation effectively negates the last clause of the provision. The provision

plainly refers to how all retirees will contribute—that is, equally by making an additional payment—not how the Plan will calculate average costs. The latter subject is dealt with in the SPD's preceding paragraph, which states that "[t]he average annual cost per participant is defined as the total claims paid by the Plan in a calendar year, divided by the total number of Plan participants during that year." UPS concedes that only *some* retirees are making additional contributions because UPS has agreed not to collect additional contributions from the IBT international retirees until 2013. All retirees are not therefore "shar[ing] equally" because the method by which they must share equally—that is, "by making an additional contribution"—has been nullified.

UPS urges us to apply the doctrine of extrinsic ambiguity and consider the extrinsic evidence presented at trial on this issue. That doctrine provides that, "[i]n limited circumstances, . . . parties are allowed to present [objective] extrinsic evidence to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what it seems to mean." *Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir. 1998). But, contrary to UPS's assertion, "[t]he fact that parties to a contract disagree about its meaning does not show that it is ambiguous, for if it did, then putting contracts into writing would provide parties with little or no protection." *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 621 (7th Cir. 1989). And there is no latent ambiguity here because the evidence does not show that a literal interpretation "would lead to an unreasonable or absurd

result." *Chi. Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983).

UPS's main contention is that interpreting the language according to its plain meaning would allow Local 705 to "wield an inordinate amount of bargaining power in that it could effectively block the Plan from collecting the additional contribution from every UPS Teamster retiree in the U.S.," contrary to the "separateness" of Local 705 from other IBT members. But just because a provision is favorable to one party does not make it "unreasonable" or "absurd." Furthermore, the language at issue is contained in the SPD, which covers almost all IBT retirees, not the CBA, which was negotiated separately by Local 705. And, as UPS repeatedly points out, it could amend the language (in accordance with ERISA) if it wanted a different result. Until then, however, the Local 705 retirees have a right to rely on the language, which unambiguously states that UPS must, if it collects additional contributions, collect them from all IBT retirees. UPS's interpretation to the contrary was therefore arbitrary and capricious.

The second issue is whether UPS violated the SPD by collecting additional contributions from the Local 705 retirees during the term of the 2008 CBA. At all relevant times, the SPD has stated that additional contributions would not be implemented until after the expiration of the "current" CBA. UPS asserts that the term "current" refers only to the 2002 CBA, into which the SPD was first incorporated. The Local 705 retirees argue that the term refers to the 2008 CBA, the CBA *now* in effect, into

which the SPD was also incorporated. They read the clause as prohibiting UPS from collecting additional contributions until the 2008 CBA expires (that is, in July 2013). The district court found that UPS's determination was within the range of reasonable interpretations and therefore not arbitrary and capricious. We agree.

When the Plan first issued the SPD in 2002, the term "current," referred to the CBA in effect at that time—the 2002 CBA. When the Plan continued to issue the same SPD even after the 2002 CBA expired, however, the term "current," on its face, referred to the CBA existing at that time—the 2008 CBA. *See Merriam Webster's Collegiate Dictionary* at 306 (11th ed. 2003) (defining "current" as "occurring in or existing at the present time"). UPS again asks us to apply the doctrine of extrinsic ambiguity and find that the term "current" "doesn't mean what it seems to mean." The argument is much better suited to this provision than it was to the previous one because here there is specific, objective evidence of the meaning of the term "current." The parties' course of dealing shows that the SPD was first incorporated into the 2002 CBA and therefore indicates that the SPD referred to the 2002 CBA and no other. In addition, the December 2007 SMM, informing the Local 705 retirees that the cap had been exceeded and that UPS would collect additional contributions when the "current" CBA expired, also shows that the SPD referred to the 2002 CBA. We need not decide whether this evidence creates an ambiguity, however, because we agree with the district court that the December 2007 SMM amended the SPD.

ERISA requires that fiduciaries provide beneficiaries with a summary of any material modification of a plan "written in a manner calculated to be understood by the average plan participant . . . ." 29 U.S.C. § 1022(a). Material modifications include changes to "requirements respecting eligibility for participation and benefits[.]" *Id.* at § 1022(b). The December 2007 SMM clearly stated that the cost "has exceeded" the cap and that additional contributions "will be effective after the expiration of the current [CBA]." This was a clear departure from the SPD—which only referred to the *possibility* of additional contributions—and notified the Local 705 retirees that UPS would no longer be picking up the tab. As we pointed out at oral argument, UPS could have completely eliminated the problem if it had specified in the December 2007 SMM that the contributions would be collected after the expiration of the "2002" CBA. Nevertheless, we find that the December 2007 SMM met the minimal requirements necessary to modify the SPD.

The Local 705 retirees argue that the December 2007 SMM failed to specify the amounts that would be collected from the retirees and was, on that basis alone, ineffective. But the retirees fail to cite any provision, regulation, or case mandating this requirement. Rather, the regulations they cite pertain to requirements for the SPD (the validity of which is not at issue here), not the plan modification. *See* 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102-3(j)(3). The Local 705 retirees raised no objections to the December 2007 SMM, issued only based on their complaints about the October 2007 SMM, which did specify amounts. We find that the December 2007 SMM

modified the SPD and made it reasonably clear that contributions would increase after the expiration of the "current" SPD—at that time, the 2002 CBA. UPS's determination that the term "current" in the SPD referred only to the 2002 CBA therefore was not arbitrary and capricious. Accordingly, there is no basis to grant the Local 705 retirees' request to increase the duration of the injunction against UPS.

For these reasons, the judgment of the district court is AFFIRMED.